IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

DR. THOMAS M. O'SHEA,              )
                                    )
        Plaintiff,                  )
                                    )
v.                                  )   CASE NO. 3:03-cv-845-F
                                    )          WO
TUSKEGEE UNIVERSITY, *et al.,*      )
                                    )
        Defendants.                 )

## MEMORANDUM OPINION AND ORDER

Dr. Thomas M. O'Shea ("O'Shea") brings claims against his former employer, Tuskegee University ("Tuskegee"), Tuskegee President Dr. Benjamin F. Payton ("Payton") and Tuskegee Provost Dr. William L. Lester ("Lester") for alleged discrimination regarding O'Shea's employment. The case is currently before the Court on the Defendants' Second Motion for Summary Judgment (Doc. # 33), filed January 7, 2005, in which Defendants contends that all of O'Shea's remaining claims fail on their merits. For the reasons set forth in this Memorandum Opinion and Order, the Court finds that the Motion is due to be GRANTED.

## I. JURISDICTION AND VENUE

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights). The parties do not contest personal jurisdiction or venue, and the Court finds adequate allegations of both.

## II. STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "An issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party. An issue is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments,* 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a

2

genuine issue for trial.'" *Id.* at 324.  To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  On the other hand, a court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor.  *Anderson*, 477 U.S. at 255.  After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).

### III. FACTS AND PROCEDURAL HISTORY

The submissions of the parties, when viewed in the light most favorable to the Plaintiff, establish the following facts relevant to the issues raised by Defendants' motion.

*A. Background Information*

*1. History of Tuskegee University*

In 1880, the Alabama State Legislature passed a bill including an annual appropriate of $2000 to fund a school for African-Americans.  In 1881, the Governor of Alabama signed a bill establishing this school as Tuskegee Normal School for training Black teachers.  The state controlled the school at this time through a three-person commission and Booker T. Washington was hired as the Administrator.  The school opened on July 4, 1881.

In 1893, the Legislature renamed the school; in 1897 the Legislature provided

additional funding.  In 1899, Congress granted 25,000 acres to the State, which allowed it to be used by the institution.  Throughout the early 1900's, the State and the federal government were involved with programs and funding of the school.  The school was renamed Tuskegee Institute in 1937.  During the 1940's, the State established a building on campus for State Extension employees, appropriated money to establish additional programs, including a graduate school in veterinary science.

In 1985, the school was renamed Tuskegee University.  The school is governed by a twenty-six member board, of which five members are appointed by the Governor of Alabama.  The school from time to time receives state funds.

### 2. The System of Faculty Teaching Appointments at Tuskegee

Teaching faculty employed by Tuskegee receive either tenure track or non-tenure track appointments.  Tenure track appointments are full-time positions that may result in academic tenure, i.e. "an arrangement under which faculty appointments in an institution of higher education are continued until retirement age, physical disability, dismissal for cause, or termination on account of financial exigency or change of instructional program." (University Handbook, 22.)  While a faculty member who has been granted tenure is not guaranteed lifetime employment, a tenured member of the faculty is protected from termination except in limited circumstances outlined in the Tuskegee University Faculty Handbook ("Handbook").  The Handbook outlines the policies and criteria governing tenure, the procedures for tenure decisions, and the procedures for non-approval and appeal of tenure

decisions.

Each tenure-track faculty member's contract is reviewed on a yearly basis and either renewed or rejected. These contracts are renewable at the option of Tuskegee, and the faculty employee has no presumption of tenure or expectation of automatic reappointment. The Handbook states, "At Tuskegee University, tenure is not automatically conferred; tenure is a privilege, not a vested right of a faculty member." (Handbook, 22.) It further states that "Tuskegee University shall be under no obligation to renew probationary appointments or special appointments and holder of such positions have no presumption of tenure, presumption of permanence or expectation of automatic reappointment." (*Id.* at 23.)

The maximum time a tenure track faculty member may remain employed without being awarded tenure is generally seven years. Tenure track faculty members apply for tenure during his sixth year of employment, and a decision regarding the tenure application is normally made at the end of that year. If tenure is not awarded, the employee receives a terminal contract, which allows the faculty member to teach one additional year while seeking a position elsewhere. Tenure track employees may also receive a terminal contract at any time that Tuskegee decides not to renew their yearly contracts.

## B. O'Shea's Employment at Tuskegee

### 1. O'Shea Accepts a Teaching Position

O'Shea, a Caucasian male, held a tenure track appointment at Tuskegee and was offered yearly contracts. O'Shea was hired as an English Instructor in August of 1993. After

receiving his Ph.D. in English in early 1994, Tuskegee promoted O'Shea to Assistant Professor in May of 1995.

### 2. O'Shea's Alleged First Amendment Speech

O'Shea alleges that, in September of 1999, he exercised his constitutionally protected right of free speech to criticize Tuskegee University regarding a new reading program that involved Lester's wife, Dr. Virda Lester. O'Shea contends that his protected speech led to denial of his tenure request, denial of his appeal of the adverse tenure decision, and termination of his employment.

### 3. O'Shea's Application for Tenure Is Denied

In January of 2000, O'Shea submitted an application for tenure with Tuskegee University.  On February 1, 2000, the College Personnel Committee considered O'Shea's application for tenure and recommended that it be denied. On March 27, 2000, the Academic Personnel Services Committee considered his application and also recommended that it be denied.

On April 28, 2000, Tuskegee advised O'Shea that his last annual contract would be for the 2000-2001 academic year (August 18, 2000 through May 18, 2001).  O'Shea signed a terminal contract with Tuskegee in December of 2000.

On May 3, 2000, Lester, as Provost, recommended that O'Shea not receive tenure. Payton, as President, officially denied O'Shea's application for tenure on June 22, 2000.  On June 23, 2000, Tuskegee informed O'Shea that he would not receive tenure and that his

6

employment would end when his terminal contract expired on May 31, 2001.

### a.  Criteria for Tenure

The decision of whether a candidate is eligible for tenure is based on nine factors:  (1) teaching and job effectiveness; (2) continued professional development; (3) service to the university community; (4) evidence of scholarship; (5) professional activities; (6) membership and leadership in professional organizations; (7) professional awards and achievements; (8) participation in college activities; and (9) research.  Sufficiency in the area of professional development, as outlined in the Handbook, requires the tenure applicant to establish, maintain or demonstrate promise of professional growth in at least three of the following categories:

1. Publication of a book . . . representing the results of research, scholarly works, professional accomplishments or creative endeavors;

2. Publication in an appropriate refereed journal of papers or renditions representing the result of research, scholarly works, professional accomplishments or creative activity;

3. Publication in an appropriate non-refereed journal of papers or renditions representing the result of research, scholarly works, professional accomplishments or creative activity;

4. Publication of at least three bulletins, pamphlets, abstracts, or the inclusion in appropriate conference proceedings or scholarly efforts representing the results of research, professional accomplishments or creative activities;

5. Preparation of audiovisual tutorial computer software or similar programs which have been accepted by a refereed source;

6. Documented or demonstrative evidence of professional development through outstanding and singular performance in the arts . . .;

7. Documented evidence of professional development through the presentation of papers or the results of scholarly activities at recognized professional meetings, seminars, symposiums, workshops, etc.;

8. Preparation of effective instructional materials, e.g. laboratory guides, audiovisual tutorial programs, and computer assisted programs to be used by students . . .;

9. Documented evidence of significant leadership or participation in the activities or recognized scholarly or professional organizations . . .;

10. Documented evidence of professional development which may include strengthening the academic programs through participation in grants and contracts, research projects/grants and international program project/grants;

11. Board Certification.

(Handbook, 19-20.)   According to Lester, having works published in one's field is an essential part of the proof necessary to establish sufficient professional development. Additionally, the publication portion of the professional development section of the tenure application states specifically that "credit is not allowed for dissertations or manuscripts not yet accepted for publication."  (*Id.*)

   *b.  O'Shea's Qualifications*

O'Shea received a teaching award in April of 1999, and a faculty service award in April of 2000; at the time of his 2000 tenure application, he received a perfect teaching score of 8.  His application for tenure also included some information to indicate that he was accomplished in four of the eleven professional development areas.  However, O'Shea's application indicated that none of his work has ever been published, although his book, *Symmetry and Identity: Reading Joyce's Style*, was in the process of being submitted for

initial consideration.

   *4. O'Shea Requests Reconsideration of the Denial of Tenure*

   Once Tuskegee University's President makes his determination on an application for tenure, the decision is final and binding.  However, the applicant for tenure may request reconsideration or appeal the decision if it was based on "insufficient information" and "additional supporting material" can be provided.  (Handbook, 24.)  Only the President of the University can make the decision to undo his decision to deny tenure.

   In January of 2001, O'Shea appealed his first denial of tenure by filing an enhanced application for reconsideration.  At this time, O'Shea received a teaching score of seven.  He submitted additional documentation in support of his application, including additional letters of recommendation.   Additionally, he provided slightly more facts to demonstrate accomplishment in four of the eleven professional development areas.  However, his lack of publications remained the same.

   The supplemented application went through the same review process as had his first application.  This time, the College Personnel Committee and the Academic Personnel Services Committee, both comprised of slightly different members, recommended that the prior ruling be overturned and his application for tenure be granted.  However, on August 30, 2001, Lester again recommended that O'Shea's application for tenure be denied, apparently because O'Shea had still not published within his field.  (Dep. Lester, 40:1-11.)  President Payton decided to uphold the previous denial of tenure on October 30, 2001.  O'Shea faults

Tuskegee University and Lester for various violations of the tenure appeal process. O'Shea also states that his application was denied because of the existence of a racial quota system in the Department of English.

*C. O'Shea's Employment is Terminated After He Is Denied Tenure*

Because he did not receive another contract to teach at Tuskegee University after the one which expired in May of 2001, O'Shea did not return to teach at the university after that date. O'Shea states that he asked Lester if he could get a continuing non-tenured appointment (i.e. an appointment on the non-tenure track) after his request for tenure was denied. Lester replied that such appointments are only available to faculty in non-major departments who are supported 100% by grant income and that, even if he waived the first requirement, he would not approve an appointment for O'Shea because of his health.

O'Shea states that Dr. Anjali Datta, a non-Caucasian Assistant Professor in the Math Department, had recently been denied tenure and received from Lester a non-tenured position even though the Math Department is a major department.

*D. O'Shea's Health Problems*

O'Shea suffered a heart attack early in his career at Tuskegee, took a leave of absence, and was allotted an additional year on the tenure track to compensate for this absence. In May of 2000, O'Shea suffered a second and substantial heart attack, which caused him to be absent during the week of semester finals. After speaking with several employees about his health and his semester grads, O'Shea had his wife drive him to campus to allow him to

deliver his signed grade sheets.  During the drive, the couple had to stop several times to allow O'Shea's vomiting, a side effect from some medicine he was proscribed.  O'Shea contends that Tuskegee discriminated against him because of his race by failing to accommodate his disability.

*E. Procedural History of Suit*

On August 8, 2003, O'Shea filed suit against Tuskegee University, President Payton, Provost Lester, and the former Dean of the College of Liberal Arts and Education at Tuskegee University.[1]  In July of 2004, O'Shea filed an Amended Complaint, setting forth claims pursuant to 42 U.S.C. § 1981, 42 U.S.C. § 1983, the Rehabilitation Act of 1973, 29 U.S.C. § 791, *et seq.*, and  42 U.S.C. § 2000d ("Title VI").[2]

On September 20, 2004, Defendants filed a Motion for Summary Judgment (Doc. #21) on statute of limitations grounds.  That Motion was granted in part and denied in part by the Court's Order (Doc. #40) of January 26, 2005.  The remaining claims are as follows:[3]

(1) a claim of race discrimination pursuant to 42 U.S.C. § 1981, in violation of the

---

[1]  The Court eventually dismissed the former Dean as a Defendant to this action because O'Shea did not timely serve her.  (Doc. # 10)

[2]"No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.

[3]All remaining claims are against all remaining Defendants with the exception of the Title VI claims, which Plaintiff concedes may not be maintained against individuals.  See Mem. Opp'n Summ. J., 1; *see also Shotz v. City of Plantation*, 344 F.3d 1161 (11th Cir. 2003).

Fourteenth Amendment pursuant to 42 U.S.C. § 1983, and pursuant to Title VI regarding failure to overturn O'Shea's denial of tenure in connection with his application for reconsideration;

(2) a claim of race discrimination pursuant to 42 U.S.C. § 1981, in violation of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983, and pursuant to Title VI regarding the handling of O'Shea's health problems connected to his May 2000 heart attack;

(3) a claim of race discrimination pursuant to 42 U.S.C. § 1981 regarding the termination of O'Shea following the denial of tenure instead of allowing him to continue in a non-tenure-track position;

(4) a claim for violation of the First Amendment right to free speech pursuant to 42 U.S.C. § 1983 regarding failure to overturn the denial of tenure in connection with his application for reconsideration.[4]

## IV.  DISCUSSION

*A. Whether Tuskegee is a State Actor*

Defendants argues that O'Shea's claims pursuant to 42 U.S.C. § 1983 fail as a matter of law because Tuskegee University does not meet § 1983's state actor requirement.  (Mot. Summ. J., 14-15.)  Therefore, before addressing the merits of the Plaintiff's § 1983 claims,

---

[4]To the extent that Plaintiff had a Title VI claim for disability discrimination that was not resolved by the Court's Order on the First Motion for Summary Judgment, the Plaintiff waived that claim by not pleading it in his Response in Opposition to Summary Judgment and by not including it as a claim he intended to pursue when questioned during the Pretrial Hearing held in this case on April 7, 2005.

the Court will address whether Tuskegee is a state actor.

Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding . . . ." 42 U.S.C. § 1983.  Therefore, to establish a claim under § 1983, a plaintiff must show "*both* an alleged constitutional deprivation 'caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible,' *and* that 'the party charged with the deprivation must be a person who may fairly be said to be a state actor.'" *Patrick v. Floyd Med. Ctr.,* 201 F.3d 1313, 1315 (11th Cir. 2000) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999)).

It is undisputed that Tuskegee is a private university.  *See Knight v. State of Ala.*, 900 F.Supp. 272, 334 (N.D. Ala. 1995) ("Tuskegee is a private institution"); *see also Ala. App. Att. Gen.*, No. 2001-015 (2000 WL 33310770), October 19, 2000 (concurring with an earlier Attorney General's Opinion in stating that "[t]he Tuskegee University is a private educational institution.").  However, O'Shea argues that it is a state actor for the purpose of § 1983 because "there is a very intertwined relationship, or a "symbiotic relationship" between the State of Alabama and Tuskegee University, such that these are participants in a cooperative

13

or joint activity which makes Tuskegee University . . . subject to a 42 U.S.C. 1983 action." (Resp. in Opp'n to Summ. J., 31.)

Private entities may be considered state actors if "there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Sullivan*, 526 U.S. at 52 (citation omitted). The nexus/joint action test, as it has come to be called, asks "whether 'the [s]tate has so far insinuated itself into a position of interdependence with the [private parties] that it was a joint participant in the enterprise.'" *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1278 (11th Cir. 2003) (quotations and citations omitted). Put another way, "'To charge a private party with [s]tate action under this standard, the governmental body and private party must be intertwined in a symbiotic relationship.'" *Id.* (quoting *Sullivan*, 526 U.S. at 51).

In an effort to demonstrate a symbiotic relationship between Tuskegee and the State of Alabama, O'Shea provides the following facts. (*See* Resp. in Opp'n to Summ. J., 28-31.) Tuskegee was founded after the Alabama State Legislature passed an annual appropriation to provide funding in 1880 when the Governor signed a bill establishing a school for teachers. Subsequent legislative acts effected the funding, land holdings, name, and governance of the school. Currently, Tuskegee is governed by a board of twenty-six trustees, five of which are appointed by the Governor, and Tuskegee receives state funds. Additionally, the Alabama legislature has passed bills noting that "Tuskegee University has

14

a unique relationship to the State of Alabama" such that it is "a private institution as well as a state related and supported institution." Act 2002-506, p. 1310 § 1; Act 2003-484, p. 1496, § 1.

While O'Shea is successful in demonstrating that Tuskegee and the State of Alabama have a significant long-time relationship, he has failed to show that Tuskegee is a state actor for the purpose of 42 U.S.C. § 1983 because he has not demonstrated a state nexus to the conduct at issue in this case. As the Eleventh Circuit has explained, "The Supreme Court has indicated that the symbiotic relationship must involve the 'specific conduct of which the plaintiff complains.'" *Focus on the Family*, 344 F.3d at 1278 (quoting *Sullivan*, 526 U.S. at 51). In *Focus on the Family*, the court held that a question of fact existed as to whether PSTA could be held liable as a state actor because plaintiff demonstrated that the rejection of proposed advertisements, which was the basis for the suit, could be attributed to bases expressly designated by PSTA as unacceptable. *Id.* Conversely, in *Sullivan*, the Court found that, although public officials were involved in administering the workers' compensation system in connection with the plaintiff's claims, the decision at issue to withhold payment for disputed medical treatment was made by private insurers and could not be attributed to the state. 526 U.S. at 51. The same result was reached in *Patrick v. Floyd Med. Ctr.*, 201 F.3d 1313, 1316 (11th Cir. 2000), where the court rejected a nexus/joint action argument because "[t]here [was] no evidence . . . that [the state] had anything to do with [the private entity's] decision to deny [the plaintiff's] application," which served as the basis for the suit.

In support of his position, Plaintiff relies on *Craft v. Vanderbuilt Univ.*, 18 F. Supp. 2d 786 (M.D. Tenn. 1998), which only goes to illustrate the requirement that the nexus involve the conduct at issue. In *Craft*, the plaintiffs complained that they were "unconsenting subjects of experiments involving radioactive ion isotopes." 18 F. Supp. 2d at 788. The court found a sufficient nexus or symbiotic relationship between the State and Vanderbuilt University because the two were jointly involved in the conception and execution of the harmful program. *Id.* at 790.

The conduct at issue in this case is Tuskegee's treatment of O'Shea regarding his tenure, termination and medical condition. The Plaintiff has failed to assert any evidence that demonstrates the involvement of the State of Alabama in these decisions. Thus, Tuskegee is not a state actor for the purpose of this case, and O'Shea cannot maintain claims against the Defendants pursuant to 42 U.S.C. § 1983. Therefore, the Defendants' Motion for Summary Judgment is due to be GRANTED as to the claims of race discrimination and violation of his First Amendment right to free speech, which are brought pursuant to 42 U.S.C. § 1983.[5]

---

[5] O'Shea's First Amendment claim also fails on its merits because O'Shea has failed to demonstrate that the development of a critical thinking course at Tuskegee is a matter of public concern. *See Morgan v. Ford*, 6 F.3d 750, 754 (11th Cir. 1993) (quotations and citations omitted) (requiring the Court to determine "whether the employee's speech may be 'fairly characterized as constituting speech on a matter of public concern"). The Court finds that this case is akin to *Williams v. Ala. State Univ.*, 102 F.3d 1179, 1183 (11th Cir. 1997) (finding that a professor's criticism of a particular text was not speech on a matter of public concern) and *Ballard v. Blount*, 581 F.Supp. 160 (N.D.Ga. 1983), *aff'd,* 734 F.2d 1480 (11th Cir.), *cert. denied,* 469 U.S. 1086 (1984) (holding that a professor's criticism of a required course

*B. Race Discrimination Claims*

O'Shea's remaining race discrimination claims pursuant to 42 U.S.C. § 1981 and Title VI are properly analyzed using the three-step burden shifting analysis applied to Title VII cases in *McDonnell Douglas* and its progeny.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Thomas v. Troy City Bd. of Ed.*, 302 F. Supp. 2d 1303, 1309 (treating § 1981, § 1983 and Title VI claims like a Title VII claim).  Under this analysis, the plaintiff has the initial burden of establishing a prima facie case of discrimination.  *See, e.g., Combs v. Plantation Patterns,* 106 F.3d 1519, 1527-28 (11th Cir. 1997), *cert. denied,* 522 U.S. 1045 (1998).  If the plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the challenged employment action.  *See, e.g., Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997).

If the employer offers a legitimate, non-discriminatory reason, the burden returns to the employee to supply "evidence . . . sufficient to permit a reasonable fact-finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Davis v. Qualico Misc., Inc.,* 161 F. Supp. 2d 1314, 1322 (*citing Chapman v. AI Transp.,* 229 F.3d 1012, 1024 (11th Cir. 2000) (*en banc*)).  This burden may be met by "persuading the court either directly that a discriminatory reason more than likely motivated

---

syllabus is not a matter of public concern) and is distinguishable from cases such as *Maples v. Martin,* 858 F.2d 1546 (11th Cir.1988) (holding that plaintiffs' speech about inadequate facilities, insufficient funding, low faculty to student ratio, accreditation status, which was not merely internal but was a sincere "effort[] to alert the public to the conditions of Auburn's ME Department," was of public concern).

the employer or indirectly that the proffered reason for the employment decision is not worthy of belief." *Id.* at 1314 (*citing Texas Dep't of Cmty Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

### 1. Alleged Failure to Accommodate O'Shea's Disability

O'Shea argues that the Defendants discriminated against him on the basis of his race by failing to sufficiently accommodate health needs related to his heart attack of May 2000. *See* Resp. in Opp'n to Summ. J., 36 (suggesting that the Court could view "Plaintiff O'Shea's disability health theory via the Rehabilitation Act or as an issue brought via 42 U.S.C. 1981 (that because of his race (White or Caucasian) and being disabled, he therefore was discriminated against) . . . ."). Defendants claim that O'Shea does not have a viable claim for discrimination under this argument because he cannot show that he suffered an adverse employment action. (Reply Summ. J., 11).

Although there is some dispute between the parties as to the requirements for a prima facie case of race discrimination, it is certain that the Plaintiff must show that "he was subjected to adverse job action. *McDonnell Douglas Corp.*, 411 U.S. at 802. The Supreme Court explained that "[a] tangible employment action [is one that] constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus. v. Ellerth*, 524 U.S. 742, 760-61 (1998) (citation omitted). The Eleventh Circuit has added that, while there is no "bright-line test for what kind of effect on plaintiff's

18

'terms, conditions, or privileges' of employment the alleged discrimination must have," the

action must effect the plaintiff's job in a "real and demonstrable way." *Davis v. Town of*

*Lake Park*, 245 F.3d 1232, 1238 (11th Cir. 2001).

In support of this claim for race discrimination, O'Shea states that he had a heart

attack on May 9, 2000, and that throughout the month of May he spoke to several Tuskegee

employees about his health and the completion of his students' semester grades.  (Aff.

O'Shea, 5.)  He further states that

> Approximately during the fourth week of May, 2000, I met with
> Dr. Benjamin Benford to deliver to him my signed grade sheets.
> Because of my health and disabling condition, I was driven to
> Tuskegee University's campus by my wife, and we had to stop
> to allow my vomiting (a side effect/reaction to Plavix, a platelet-
> reducing drug prescribed for me in the aftermath of tent
> placement following my heart attack).

(*Id.*)  The record before the Court does not indicate that O'Shea was required by Defendants

to be driven to the university at this time to deliver his grades in this manner.  However, even

assuming that such performance was required, this incident clearly does not rise to the level

of adverse employment action.  *See Davis*, 245 F.3d at 1239 ("the employee's subjective view

of the significance and adversity of the employer's action is not controlling; the employment

action must be materially adverse as viewed by a reasonable person in the circumstances.").

Contrary to the requirements of *Ellerth*, this incident did not "constitute[] a significant

change in employment *status*."  524 U.S. at 760-61 (emphasis added).  Instead, it is exactly

the type of incident governed by the mantra that "every unkind act" will not be held to violate

Title VII. *Wu v. Thomas*, 996 F.2d 271, 273-74 (11th Cir. 1993). Moreover, the Plaintiff has failed to provide a scintilla of evidence that the requirement that he turn in grades in person (if indeed, this was a requirement) was in any way related to Plaintiff's race. Therefore, the Defendants' Motion for Summary Judgment as to this claim is due to be GRANTED.

### 2. Refusal to Overturn the Prior Tenure Decision

O'Shea also argues that the Defendants discriminated against him because of his race by failing to reverse, upon reconsideration, its earlier ruling denying him tenure. (Resp. in Opp'n to Summ. J., 19-27.) Defendants respond that O'Shea cannot make out a prima facie case of race discrimination based on denial of tenure and cannot rebut the Defendants' legitimate non-discriminatory reason.

Even assuming, *arguendo*, that O'Shea has a prima facie case of race discrimination, he has failed to demonstrate that the Defendants' reason for denying his request for tenure is pretextual. The employer's burden in asserting a legitimate, non-discriminatory reason is "exceedingly light." *Holifield*, 115 F.3d at 1564 (citations omitted). This burden is one of production, not persuasion, and consequently, the employer need only produce evidence that could allow a rational fact-finder to conclude that the challenged employment action was not made for a discriminatory or retaliatory reason. *See, e.g., Davis v. Qualico Misc., Inc.*, 161 F. Supp. 2d 1314, 1321 (M.D.Ala. 2001). Defendants have this burden by asserting that O'Shea was denied tenure upon reconsideration because of Lester's recommendation that

O'Shea be denied tenure because he was not published in his field.  *See* Dep. Lester, 40:1-11 (stating that he stayed with the same decision he made in 2000 because on review of O'Shea's supplemented application "there was still no publications").

O'Shea argues that the asserted reason is pretextual because the evidence shows the existence of a racial quota system, whereby only one or two white professors in the English Department could be tenured at the same time.  In support of this theory, O'Shea states (1) that the English Department had two white tenured faculty members in early 1992, (2) that during 1992 the number dropped to one faculty member, namely Dr. Bruce Adams, and (3) that the day before O'Shea's application for tenure was denied, the school approved the tenure application of Dr. Gebhard, bringing the number of white tenured faculty members in the department to two.  O'Shea contends that this demonstrates that the quota is one to two white tenured faculty members, such that they refused to make him the third on this basis. This information is not helpful to O'Shea's case as "[s]tatistics without an analytical foundation are virtually meaningless."  *Evans v. McClain of Ga., Inc.*, 131 F.3d 957, 963 (11th Cir. 1997) (quotation and citation omitted) (finding that information regarding how many supervisory employees were black were merely "anecdotal" when it was not accompanied by information such as how many blacks had applied for such positions).  In this case, O'Shea does not indicate how many persons of each race applied for tenure during the relevant time period, he does not indicate how many minority applicants received tenure, and he does not present any other information that would tend to indicate that Lester or

21

anyone else at Tuskegee created a racial quota for tenured English professors.  Therefore, O'Shea's quota theory does not demonstrate that Lester's publication requirement was pretextual.

O'Shea also argues that the asserted rationale is pretextual because the publication requirement expressed by Lester is not stated in the handbook.  However, Lester explained that he sees a difference between the basic eligibility requirements for tenure and requirements for gaining his recommendation.  (Dep. Lester, 32:5-33:5.)  Additionally, he stated that beyond the criteria in the handbook and the recommendations of the committees, "it is my responsibility also to make an independent judgment, which I did."  (Dep. Lester, 48-49:9).  Merely because Lester, in his subjective judgment, relied on a criterion not clearly set forth in the handbook does not indicate that his proffered reason is pretextual.  *See Jackson v. Harvard Univ.*, 721 F.Supp. 1397, 1404 (D.Mass. 1989) ("Finally, more subjectivity is permitted with respect to academic tenure decisions than might be tolerated in other Title VII settings.  This is because of the difference between the selection of a craftsman and of a professional. A bricklayer who can properly lay a specified number of bricks in a specified period is ordinarily as good as any other bricklayer likely to appear. But in the selection of a professor . . . while there may be appropriate minimum standards, the selector has a right to seek distinction beyond the minimum indispensable qualities."); see also *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 376 (4th Cir. 1995) (quotations and citations omitted) ("We must be ever vigilant in observing that we do not sit as a 'super

personnel council' to review tenure decisions, always cognizant of the fact that professorial appointments necessarily involve subjective and scholarly judgments . . . .").

Additionally, O'Shea argues that the rationale is clearly pretextual because Lester did not follow the procedure outlined in the Handbook, which requires that

> If the evaluation of the Provost is significantly different from that of the Academic Personnel Services Committee, the chair thereof shall be so informed.  If their differences cannot be resolved, the Provost may request a meeting with the Academic Personnel Services Committee.  The joint meeting shall take place within thirty days after the recommendation has been submitted to the Provost by the Academic Personnel Services Committee.  If the joint meeting results in resolution of the differences, a joint recommendation shall be sent to the President.

(Faculty Handbook, 24.)  In this case, Lester's recommendation upon reconsideration that tenure be denied was contrary to the committee recommendations that tenure be granted. (Pl. Ex. 9, 1-2.)  Lester did not notify Dixon, the chair of the relevant committee, that his recommendation was contrary to the committee's, nor did he try to resolve their differences. (Aff. O'Shea, 7.)

Failure to follow normal procedures can indicate discrimination on the part of the employer. *See Alexander v. Chattahoochee Valley Comm. Coll.,* 325 F. Supp. 2d 1274, 1282 (M.D. Ala. 2004) (citing *Bass v. Bd. of County Comm'rs,* 256 F.3d 1095, 1108 (11th Cir. 2001)). However, O'Shea has not indicated that Lester's normal procedure was to follow the Handbook when his recommendation differed from that of the Committee. To the contrary, O'Shea admits that of the eleven tenure applicants recommended by Committee that then

23

came before Lester, Lester denied tenure as to four of them and did not follow the Handbook procedures in any of those cases.  (Aff. O'Shea, 7).  Therefore, Lester's failure to follow the Handbook procedures in O'Shea's case does not indicate that his asserted reason was pretextual.

Next, O'Shea argues that discrimination can be inferred from the fact that Lester was harsh with him when discussing his tenure application and told him that he did not deserve to be a faculty member.  In that same conversation, however, Lester asked him, "Where are your publications? Where are your grants?" (Aff. O'Shea, 8-9.) Because Lester's allegation that O'Shea did not deserve to be a faculty member was in the context of pointing out his lack of publications, instead of indicating that Lester's reason was pretextual, it supports a finding that Lester's asserted reason was true.

O'Shea also argues that the fact that John Frandsen's tenure application was denied indicates that the publication requirement was pretextual.  (Resp. in Opp'n Summ. J., 20.) Dr. Frandsen, a white faculty member, was denied tenure in 1998 after an adverse recommendation by Lester.  (Aff. Frandsen, 1-2.)  Both the College Personnel Committee and the Academic Personnel Service Committee recommended that he be granted tenure. (*Id.*)  However, Dr. Lester rejected his application for tenure in spite of the fact that he was published in his field.  (*Id.*)  Logically, however, the fact that a white faculty member published and did not receive tenure fails to conclusively establish that publication is not required for tenure.  Instead, it merely suggests that publication, while required, does not

guarantee tenure.

In conclusion, O'Shea has not asserted evidence that creates a genuine issue of material fact as to whether "the defendant intentionally discriminated against [him] because of his race." *Mayfiled v. Patterson Pump Co.*, 101 F.2d 1371, 1376 (11th Cir. 1996) (explaining that once a legitimate reason is asserted, the Plaintiff's burden of proving that it is pretextual merges with his ultimate burden to demonstrate intentional discrimination). Therefore, the Defendants' Motion for Summary Judgment as to this claim is due to be GRANTED.

### 3. Termination of O'Shea Instead of Allowing Him to Continue in a Non-Tenure Track Position

As this Court stated in its Order (Doc. #40) on the Defendants' First Motion for Summary Judgement (Doc. #21), a claim for race discrimination arising from the fact that O'Shea was terminated instead of offered a non-tenured position would not be barred by the applicable statute of limitations when brought pursuant to 42 U.S.C. § 1981.[6]  Although Plaintiff does not argue this claim in his Response in Opposition to Summary Judgment, he does include two paragraphs in his facts section regarding this claim.   Additionally, Plaintiff's counsel indicated at the Pretrial Conference held in this case on April 7, 2005, that

---

[6]Defendants continue to assert that the Court incorrectly applied a two-year instead of a four-year statute of limitations to this claim.  Reply Summ. J., 7 n.2, citing *Jones v. R.R. Donnelley & Sons Co.*, 124 S. Ct. 1836 (2004) for the proposition that the two-year statute of limitation applies because the claim is one for discrimination in formation of a contract. Because the Court adequately addressed this issue in its first Order (Doc. #40), it will not revisit the issue at this time.

he wishes to proceed on this claim.

Again, assuming that O'Shea can demonstrate a prima facie case of race discrimination as to this claim, he fails to demonstrate that the asserted reason is pretextual. O'Shea's affidavit states that he asked Lester if he could get a continuing non-tenured appointment and that Lester replied that such appointments are only available to faculty in non-major departments who are supported 100% by grant income. (Aff. O'Shea, 7). O'Shea then states, "Even if Defendant Lester could have waived the first requirement, which he said he could not do because the English Department offered a major, he stated that he would not approve such an appointment for me, because the anxiety and effort of obtaining grant funding would be too harmful for my "health."" (*Id.*)

The only facts asserted by the Plaintiff that might tend to show that Lester's concern for O'Shea's was a pretext for race discrimination is the comparator evidence regarding Dr. Datta. O'Shea states that Dr. Anjali Datta, Assistant Professor in the Math Department had been denied tenure but that she received from Lester a non-tenured continuing position. (Aff. O'Shea, 7-8.) Dr. Datta is a non-Caucasian faculty member. (Lester Dep. 133:15-16.)

O'Shea does not address whether Dr. Datta's non-tenured position is entirely grant funded, whether similar grant funding would have been available to fund a non-tenured position for him, or whether Dr. Datta had health concerns and was still permitted to remain by Lester. From the evidence before the Court, O'Shea has not demonstrated that the asserted concern over his health was merely a pretext for discrimination on the basis of his

race. *See Davis*, 161 F. Supp. 2d at 1322 (citation omitted) (requiring the Plaintiff to furnish "evidence . . . sufficient to permit a reasonable fact-finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision"). Therefore, the Defendants' Motion for Summary Judgment as to O'Shea's claims of race discrimination is due to be GRANTED.

## V.  CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. # 33) is GRANTED.  A final judgment will be entered consistent with this Memorandum Opinion and Order.

DONE this the 27th day of April, 2005.

_____
         /s/ Mark E. Fuller
CHIEF UNITED STATES DISTRICT JUDGE